Boyd **CARVER**, by and through his Conservator, Norva **CARVER**, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

No. C–81–4035–WWS.

United States District Court, N.D. California.

May 29, 1984.

R. Jay Engel, Engel & Babcock, San Francisco, Cal., for plaintiffs.

Kimberly A. Reiley, Asst. U.S. Atty., San Francisco, Cal., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OF OPINION

SCHWARZER, District Judge.

This is an action under the Federal Tort Claims Act in which plaintiffs allege that physicians at Letterman Army Medical Center (LAMC) negligently subjected plaintiff Boyd Carver to radiotherapy and thereby caused him injury. The Court has jurisdiction and venue lies in this district. Trial was held before the Court on May 21–24, 1984.

### FACTUAL BACKGROUND

Boyd Carver, who was 56 years old at the time, was admitted to LAMC on April 1, 1979, with complaints of staggering gait, clumsiness, left hand weakness, slurred speech and personality change. He had had symptoms of lethargy and irritability since February. In November, 1978, he had had a flu-like illness during which he first developed left sided weakness and clumsiness. A brain scan performed at Oak Knoll Naval Hospital in December, 1978, was negative. The Oak Knoll treating physicians had found no significant neurologic deficit and ruled out neuropathic illness and as a result sent Carver home. His symptoms had partially cleared in December and January and then recurred in February with progressive problems until his admission to LAMC.

Carver was assigned to Dr. John Steel, then a resident in neurology who served under the direct supervision of Dr. George Wambaugh, a staff neurologist. Dr. Steel was Carver's primary physician and responsible for coordination of consultations and care.

On April 2, Carver was presented at morning rounds. On April 3, he was sent to St. Luke's Hospital for a CT scan which was inconclusive. He was then sent to the University of California Medical Center for another CT scan, using a more advanced and powerful scanner. This was performed by Dr. T.H. Newton, considered one of the leaders in the field of neuroradiology. Dr. Newton reported to LAMC that the "most likely diagnosis is multiple metastatic neoplasm."

Based on this report an extensive search was made for the primary site of the cancer. Tests included a liver and spleen scan, lung tomograms, an IVP, sigmoidoscopy, bronchoscopy, and a bone scan. None of these tests located the primary site. Consultations were also had with cardiology, hematology-oncology, nuclear medicine, radiotherapy, neurosurgery, pathology, proctology, and the diabetic and immunization clinics.

During this period of searching for the primary site, from April 3 through April 23, Carver's condition declined steadily. On April 4, he had an attack of nausea and dizziness, accompanied by EKG changes. This indicated to the doctors a possible shift or sudden enlargement of a tumor. On April 6, he first experienced dizziness when he sat or stood up. He improved slightly on April 5 and 6, but diploplia, or double vision, was first observed on April 7. This indicated to the doctors third nerve involvement and possible spreading of the metastases.

The diploplia continued for three days and on April 10 Carver was placed on Decadron, a steroid, to control progressive metastasis of the cancer. On April 11, Carver began to hiccup and felt nauseous, which was considered a serious sign indicating possible involvement of the brain's respiratory center. The Decadron dosage was increased.

On April 12, Carver was still complaining of hiccups. On April 13, he was feeling worse and the diploplia and hiccups continued. He was given Thorazine on April 14 which appeared to help the hiccups. By this time he had lost 10 pounds since his admission; anorexia and weight loss were

considered possible signs of a progressive cancer.

From April 16 to 18, Carver was getting worse and continued to get very little sleep due to hiccups. He had increased irritability, and had fallen while going to the bathroom. This fall suggested that his neurologic condition was degenerating which the attending physicians attributed to rapidly spreading cancer. Dr. Steel then considered Carver for palliative radiotherapy and requested a radiotherapy consultation. Carver was examined by the radiotherapist, Dr. Stephen Sorgen, who noted that an extensive search for a primary site of metastases had been unrewarding, and recommended a biopsy of one of the lesions if possible. He stated that although this was most likely metastatic disease, identifying the cell type would help direct further therapy. Dr. Sorgen noted that if a biopsy was not possible, he would proceed with radiotherapy of 3600 rads over two and a half weeks.

Meanwhile, to control the worsening symptoms, steroids were continued and some objective evidence of improvement noted.

On April 19, Dr. Steel requested a consultation from neurosurgery in order to evaluate Carver for a brain biopsy prior to radiotherapy. Dr. Stanley Shatsky, a neurosurgeon, examined him and the CT scans, and concluded "I do not feel the risk of biopsy is indicated in this patient in that there is no chance for surgical cure, and bilateral multiple lesions are likely metastasizing, though primary RCS [reticulum cell sarcoma] of brain is a reasonable differential. Multiple abscesses would likely be very positive on brain scan, as well as show surrounding inflammatory edema and shift." Dr. Shatsky recommended that radiation therapy and chemotherapy proceed.

Before radiotherapy was started, another CT scan was done on April 24. That scan was interpreted to show that there was a progression of the metastases seen on the prior scan. Radiotherapy was initiated on the afternoon of April 24. On April 26, it was noted that the patient was undergoing

the therapy well and that he was feeling better. He had no diploplia and had stopped hiccupping. On April 28, the patient's gait began to improve and become steady. He went on an outing with his wife and reported having had a good day.

On April 30, his gait had greatly improved and he had less ataxia. On May 9, the gait and neurologic condition continued to improve. Radiation was completed on May 9, and another brain scan was performed. That scan showed improvement. Carver was discharged May 12, 1979.

Following his discharge, Carver lived at home. He and his wife took a long trip. He gradually became weaker and late in 1979 and again early in 1980 he returned to LAMC. He was diagnosed in 1980 as possibly having multiple sclerosis. His physical and mental condition continued to deteriorate and he was eventually placed into a convalescent home where he now lives.

## PLAINTIFFS' CONTENTION AND EVIDENCE

Plaintiffs contend in substance that the physicians at LAMC acted below the standard of care in administering radiation therapy without having sufficient evidence of metastatic brain disease, not having located the primary site of the cancer or having taken a biopsy of the suspected metastatic tissue in the brain. As a result, plaintiffs contend, Carver was subjected to radiation which may have been unwarranted and suffered damage to his brain tissue which may account for or at least have contributed to, his present condition.

Plaintiffs place their principal reliance on the testimony of Dr. Kirby Gale, a board certified neurologist. Dr. Gale testified that the standard of care required that the LAMC doctors obtain more evidence than they had before embarking on radiotherapy in view of the risk of harm which attends that therapy. The only means of obtaining additional evidence mentioned by Dr. Gale was a tissue diagnosis for which a biopsy was required. Dr. Gale testified that he considered Dr. Steel to have acted below

the standard of care in referring Carver for radiotherapy without a biopsy and Dr. Shatsky to have acted below the standard of care in declining to perform a biopsy on the basis of risk since, according to Dr. Gale, the lesions were located in non-dominant regions of the cranial hemisphere.

Dr. Gale's testimony, taken in its entirety, however, does not support plaintiffs' argument. He acknowledged, to begin with, that reasonable doctors could have differed on the diagnosis; hence, he does not charge that making the diagnosis of metastatic cancer was below the standard of care. Nor did he testify that Carver at the time did not in fact have metastatic cancer or that, had he had it, the treatment was improper.

It is not disputed that taking a biopsy for a tissue analysis prior to radiotherapy is the normal and preferred method of proceeding. But Dr. Gale acknowledged that a negative biopsy does not necessarily rule out the presence of cancer, since the tissue sample obtained is very small. Therefore, he agreed, that it would have been proper for a physician faced with the facts of Carver's condition, to diagnose metastatic cancer even in the face of a negative biopsy and, if he judged the patient's condition to be sufficiently desperate, to elect to proceed with radiotherapy on the strength of the available evidence. He acknowledged that the question whether to proceed with therapy is essentially a matter of balancing the dangers of treatment without biopsy against the dangers of deferring treatment. When the probable risk of harm from a biopsy exceeds that inherent in treatment, Dr. Gale considered it to be within the standard of care to proceed without a biopsy.

Although Dr. Gale's testimony may not be wholly consistent and free of ambiguity, the Court is compelled to interpret it as acknowledging that the decision whether to proceed to radiotherapy—whether the evidence of cancer is sufficient, and whether a biopsy would be too dangerous to risk—is a matter of judgment. Clearly, Dr. Gale's testimony, as well as the testimony of Dr. Gershow, plaintiffs' other expert witness, and all of defendant's witnesses who testified on the point, establishes that failure to take a biopsy is not below the standard of care per se; the decision whether to require one depends on the circumstances of the particular case. Dr. Gale conceded that it was not below the standard of care for Dr. Steel to accept the judgment of Dr. Shatsky, an experienced neurosurgeon, that a biopsy would be too dangerous. Plaintiffs' final argument—that LAMC should have placed a more experienced neurologist than Dr. Steel in charge of this admittedly difficult case—is completely meritless. There is no evidence that Dr. Steel was not adequately supervised or that the *process* by which the decision to give therapy was made did not meet the standard of care.

In that connection, note should be taken of a peripheral argument urged by plaintiffs. Plaintiffs showed, mainly on cross-examination of defendant's witnesses, that some of Carver's symptoms were consistent with a demylenating disease, and such a disease (multiple sclerosis) was in fact considered a likely diagnosis nearly a year later. Lumbar punctures and tests of cerebral spinal fluid done in April 1979 reflected an elevated protein level and white blood cell count, somewhat non-specific symptoms of a demylenating process. But there is no evidence that it was below the standard of care in 1979 either not to pursue further tests (e.g. for oligoclonal bands) or not to diagnose multiple sclerosis. In this respect, the state of the art has changed over the last five years. Dr. Steel, for example, assumed that multiple sclerosis need not be considered since it virtually never strikes persons over fifty, an assumption acceptable then but no longer accepted today. What plaintiffs seem to suggest in effect is that the presence of symptoms of a demylenating process diminishes the weight of the evidence of cancer. In the light of all of the testimony, however, and in the absence of proof that the failure to take further tests for demylenating disease was below the standard of care, that argument must be rejected.

Plaintiffs' other witness was Dr. Jay Gershow, a non-board certified internist with specialties in hematology and oncology. Dr. Gershow testified that it was below the standard of care for the doctors to prescribe radiotherapy without a biopsy and for Dr. Shatsky to reject a biopsy as too risky.

Dr. Gershow is not a neurologist, a radiotherapist, or a neurosurgeon. He produced no credentials qualifying him to practice in those highly technical fields, let alone to express an opinion as to the governing standard of care. Dr. Gershow trespassed beyond the legitimate scope of his expertise, not simply to express a gratuitous opinion, but to impugn the competence and professional standing of other physicians.

This is the second time Dr. Gershow has appeared in this Court to testify against other physicians while lacking both the competence and a factual basis for doing so. Such irresponsible conduct by a witness, and counsel's solicitation of it, undermine the integrity of the judicial process and are an affront to the ethics of the medical profession. It is a matter of concern to this Court and ought to be one for the medical profession as well.

## DEFENDANT'S EVIDENCE

Dr. Steel testified that, after extensive workups and consultations with specialists, the evidence supporting a diagnosis of metastatic brain cancer, though not conclusive, appeared to him overwhelming. There were five principal factors on which his conclusion rested:

(1) Carver had had a long history of heavy smoking and some suspicious chest X-rays, raising the possibility of cancer.

(2) The report on the CT scan by Dr. Newton, whom Dr. Steel greatly respected, listed brain cancer as the most likely diagnosis.

(3) Carver's rapid deterioration suggested tumor growth while his favorable response to steroid treatment was consistent with tumor shrinkage.

(4) Metastatic brain disease is relatively common.

(5) Other diseases had been ruled out. In particular, he had ruled out post-infectious encephalitis because the course of the disease was inconsistent and the white cell count in the spinal fluid not sufficiently elevated. He did not consider multiple sclerosis because in 1979 it was held to be virtually impossible for a person over fifty to contract that disease.

Dr. Newton confirmed at trial that metastatic brain disease was indicated by the presence of numerous lesions shown on the 1979 scan. The absence of metastases on later scans may reflect successful radiotherapy rather than absence of metastatic brain disease in 1979.

In making his decision to refer Carver for radiotherapy, Dr. Steel took into account the failure to locate a primary cancer site but did not consider that a ground for deferring radiation therapy for several reasons:

(1) A primary site in the lung could be too small to locate yet metastasize rapidly;

(2) Cancer lesions could reach the brain without being trapped in the lung;

(3) Even if Carver's cancer had been reticulum cell sarcoma (RCS), a rare form of cancer having its primary site in the brain, rather than metastatic neoplasm, the indicated treatment would have been the same.

(4) Carver's deteriorating condition created an urgent need for prompt therapy.

(5) A biopsy had been ruled out by Dr. Shatsky as too risky.

The decision to proceed with radiotherapy was made jointly by Dr. Steel (who had also consulted with Dr. Wambaugh) and Dr. Sorgen. The latter considered the evidence of metastatic brain disease overwhelming. While he requested a biopsy, he accepted Dr. Shatsky's judgment that it was too risky. He testified that he regards a biopsy desirable for a full evaluation but is prepared to proceed with therapy without one if the risk inherent in a biopsy outweighs the risk of harm from radiation. Because the radiation dosage given to Carver was low, the risk of brain damage was only about .5%. In these circumstances, he considered it to be within the standard of

care to give radiotherapy without having performed a biopsy or located a primary site and, although it is not usual, he has done so in several other cases.

The decision of the LAMC physicians in April 1979 was supported by two qualified expert witnesses produced by defendant. Dr. Richard F. Gravina, a board-certified neurologist, testified that the symptomology and clinical course of Carver's disease in April 1979 was consistent with metastatic brain disease. Based on the clinical presentation and the radiological investigation, that was the most likely diagnosis. Because of the patient's progressive deterioration, it was appropriate to proceed with radiation treatment without a biopsy. Whether to perform a biopsy is a technical decision only the neurosurgeon could make and it was appropriate for the neurologist in charge to rely on that decision. It is not unusual for metastatic cancer to present first in the brain. When the associated symptoms appear, as they did here, the patient is in danger and immediate treatment is indicated.

Dr. Theodore L. Phillips is a board-certified radio therapist and chairman of the department of radiation oncology at the University of California in San Francisco. He testified that it was appropriate to initiate radio therapy on Carver in April 1979 and that the physicians had taken reasonable care to determine the nature of the disease. Given the course of the disease, including the severe hiccups, weight loss, dizziness and diplopia, and Dr. Newton's interpretation of the CT scan, the most likely diagnosis was brain cancer. In the face of the patient's deteriorating condition, the evidence of metastases and the neurosurgeon's decision that the risk of a biopsy was not justified, radiotherapy was justified. The value of radiotherapy in such cases is well-documented: it relieves neurological symptoms and may prolong life.

Evaluating the evidence as a whole, the Court concludes that plaintiffs have failed to sustain their burden of proving by a preponderance of the evidence that the physicians at LAMC acted below the level of care in prescribing and administering radiotherapy to Carver in April 1979. The decision they confronted required them to make a judgment on the evidence they had, balancing the risks of therapy against the risks of inaction. Perhaps some physicians might have struck the balance differently. But there is no credible evidence that the physicians failed to do what in the circumstances the standard of care required or did what in the circumstances the standard of care precluded. Plaintiffs do not attack as being below the standard of care either the diagnosis of metastatic cancer or the choice of radiotherapy as treatment for that disease. Stripped of its forensic window dressing, the issue posed by plaintiffs is simply the sufficiency of the evidence to warrant therapy. Thus the case is nothing more than an ex post facto attack on the exercise of judgment by the physicians on the firing line. It has no merit and must be dismissed.

For the reason stated, the complaint is dismissed and judgment will be entered for defendant with costs.

IT IS SO ORDERED.